

U.S. DISTRICT COURT
EASTERN DISTRICT-WI
FILED
'10 APR 23 A9 57
JON W. SANFILIPPO
CLERK

Copy hand-delivered
to chambers

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.                            Case No. 09-CR-310

CHRISTIAN ANDREJAT,

    Defendant.

## PLEA AGREEMENT

1.    The United States of America, by its attorneys, James L. Santelle, United States Attorney for the Eastern District of Wisconsin, and Gail J. Hoffman, Assistant United States Attorney, and the defendant, Christian Andrejat, individually and by attorney Adam Essling, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.    The defendant has been charged in one count of a seven-count indictment which alleges violations of Title 21, United States Code Sections 841(a)(1), 843(b) and 846 and Title 18, United States Code Sections 4, 922(g)(1), 924(a)(2), 1952(a)(3), and 2.

3.    The defendant has read and fully understands the charge contained in the indictment. He fully understands the nature and elements of the crime with which he has been charged, and the charge and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4. The defendant voluntarily agrees to plead guilty to the following count set forth in full as follows:

## COUNT THREE

*THE GRAND JURY FURTHER CHARGES THAT:*

*1. Between on or about March 2008 to December 1, 2009, in the State and Eastern District of Wisconsin and elsewhere,*

### CHRISTIAN G. ANDREJAT

*knowingly and intentionally conspired with each other, and with persons known and unknown to the grand jury, to distribute controlled substances in violation of Title 21, United States Code, Section 841(a)(1).*

*2. The offense involved a mixture and substance containing heroin, a Schedule I controlled substance.*

*All in violation of Title 21, United States Code, Sections 841(b)(1)(C) and 846.*

5. The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offense described in paragraph 4. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the following facts beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt:

On July 25, 2008, Nicholas Dybul celebrated his last birthday. Dybul and his girlfriend, K. M., purchased heroin to mark the occasion. The two, both heroin addicts, used K.M.'s phone to arrange the transaction. Their source was Joshua Parent; they left a message on Parent's phone and he returned the call using Josh Anderson's phone. Dybul

and K.M. made arrangements to purchase the heroin from Parent at a gas station located at W. Layton and W. Loomis Road.

When they met, Milke purchased three $20 bindles of heroin from Parent. They each used one bindle, and Dybul kept the third for the next morning because, according to Milke, it "levels him out for the day." Dybul used the third bindle, and it killed him.

Immediately after Dybul's death, K.M. cooperated with law enforcement authorities. Her cooperation led authorities to Parent, which, in turn, led to Christine Perkins, the source for his heroin that he sold to K.M. and Dybul. The investigation then led to her boyfriend, Keith Wilson, and their assorted relatives.

On December 31, 2008, case agents interviewed Melissa Bartelme and Christian Andrejat at the Milwaukee HIDTA. Melissa Bartelme had been arrested by the Cudahy Police Department for Possession of Drug Paraphernalia and expressed a desire to cooperate with police regarding her knowledge of heroin trafficking activities. Bartelme said she first started snorting Oxycontin about one and a half years ago. About four to five months ago, she began snorting heroin. In about July 2008, Bartelme began buying heroin from Myles Reno. She would contact Reno by calling him at (414) 403-8830. Bartelme said she was buying two to three $10 bags per day and was sharing those with Andrejat. Reno also showed Bartelme and Andrejat how to inject heroin.

Bartelme stated she also purchased about one $10 bag of heroin from "Josh" per week. Bartelme viewed a booking photo of Joshua Parent and identified him as the person she knows as "Josh". After buying heroin from Reno for awhile, Bartelme accompanied Reno when he purchased heroin from "Pooh," his supplier. "Pooh" then told Bartelme she

could contact her directly. Bartelme identified a photo of Christine Perkins as the person she knows as "Pooh."

Bartelme then began purchasing heroin directly from Christine Perkins. Bartelme would call Perkins and then meet her in the area of 71st and Villard Avenue. Upon meeting, Perkins would call her supplier who would come to meet Perkins. The supplier delivered the heroin to Perkins, and Perkins then delivered the heroin to Bartelme. Bartelme said if she purchased $100 worth of heroin, the supplier would give Perkins 11 $10 bags of heroin. Perkins would keep the one extra bag and also keep two more of the remaining ten as her commission for arranging the transaction.

Bartelme stated after Joshua Parent's arrest in July, 2008 Parent tried to "set Perkins up" by ordering 80 bags of heroin. Bartelme said Myles Reno had already warned Perkins about Parent's arrest, so Perkins never met Parent. Bartelme said Perkins then changed her phone number and began telling people her supplier was no longer selling heroin, but Bartelme did not believe her. Bartelme said she thought Perkins was getting the same amount of heroin from her supplier, but Perkins was then taking about half of the heroin out of each $10 bag and repackaging it. Perkins would then sell the extra heroin as another $10 bag. Bartelme continued purchasing about $100 worth of heroin from Perkins every day for about two months, but said the quality of the heroin and size of the bags had decreased.

Myles Reno then began taking Bartelme and Andrejat to meet another source, known to Bartelme as "Bonnie." Bartelme identified a photo of Jeanette Perkins as the person she knows as "Bonnie." After meeting Jeanette Perkins several times, Perkins told

Bartelme that she recognized Bartelme after seeing her with Christine Perkins. Jeanette Perkins told Bartelme she was Christine Perkins' aunt.

Bartelme stated they would meet Jeanette Perkins in the alley behind her house at 1xx W. Wright Street. Jeanette Perkins would come out to the car and use Bartelme's phone to contact her supplier. Bartelme stated she and Andrejat shared a cell phone with the number (414) 916-1338. Records obtained from AT&T indicated the subscriber for this phone is R.A. of 1xxx8 Brookside Dr., Hales Corners, WI. Bartelme stated the supplier was the same supplier with whom Christine Perkins had been dealing. Bartelme, Andrejat, and Jeanette Perkins would then drive to meet the supplier. Jeanette Perkins obtained the heroin from the supplier and delivered it to Bartelme. Perkins kept one of the bags of heroin as a commission for arranging the transaction. Bartelme said the bags of heroin were larger and better quality than those she had been getting from Christine Perkins.

Bartelme said she had been buying between $30 and $200 worth of heroin from Jeanette Perkins and the supplier for the last few months. Most of the heroin was for her use and Andrejat's use, but if a friend needed some she might sell them a bag or two. Bartelme said Jeanette Perkins began acting nervously a little while ago after two of Bartelme's friends, "Josiah" and "Lauren" got arrested after buying heroin from Jeanette Perkins. Milwaukee Police Department reports show that J.P. and L.B. were arrested near 1st and Wright on October 31, 2008 for delivering heroin to an undercover officer.

Bartelme stated she still contacted Christine Perkins for heroin on occasion. Perkins' boyfriend, "Manny" also sold heroin with Perkins. Bartelme identified a photo of Keith Wilson as the person she knows as "Manny." Bartelme stated that Wilson appeared to be

5

Case 2:09-cr-00310-RTR   Filed 04/23/10   Page 5 of 20   Document 161

in charge because when a problem existed or Bartelme needed to be "fronted" heroin, they always had to speak to Wilson. Wilson and Perkins changed their phone numbers often so that the police would not discover their number.

Case agents also interviewed Christian Andrejat who stated he was aware of a heroin dealer named "Bonnie." Andrejat identified a photo of Jeanette Perkins as the person he knew as "Bonnie." Andrejat also identified a photo of Christine Perkins as a person he knows as "Pooh." Andrejat believed Christine and Jeanette Perkins were related. To purchase heroin, Andrejat traveled to Jeanette Perkins' house, parked outside, honked the horn, and Perkins would come to the car. Perkins usually used Andrejat or Bartelme's cell phone to call her supplier. Andrejat or Bartelme told Bonnie how much heroin they wanted and Bonnie ordered it from her supplier. They usually ordered 11 "dime" bags for $100 and it came wrapped in foil. Jeanette Perkins has a sister who lived in a red house in the area of N. Palmer St. and E. Chambers, on the west side of the street, and is the third house from Chambers. Case agents know that address to be 29XX N. Palmer St., the address of Angela Perkins. At times, Bonnie went to this house in order to obtain heroin for Andrejat and/or Bartelme.

Telephone records obtained from U.S. Cellular indicated the customer using (414) 419-8718 had requested a new telephone number on July 29, 2008, and was now assigned telephone number (414) 419-0778 with the identical subscriber ("Sam Doe") and billing (a Chicago, IL address) information as (414) 419-8718.

On February 18, 2009, at about 1:00 p.m., case agents conducted a controlled buy from Keith Wilson. At about 1:15 pm, CS-3 placed a phone call to (414) 419-8447

[subscribed to by Sam Doe and used by Keith Wilson and Christine Perkins] and ordered $60 worth of heroin from Wilson. Wilson told CS-3 to meet him in the alley behind 25xx N. Buffum Street. Case agents established surveillance at that location and observed Wilson exit the rear door of the residence.

While awaiting Wilson in order to conduct the controlled buy, case agents observed a 2006 black Chevrolet Cobalt 2-door, bearing Wisconsin license plate 554-KSN, drive up to Wilson. A review of Wisconsin Department of Transportation records revealed this license plate number listed to M.A.B., of Franklin, WI. (Case agents conducted a traffic stop of this vehicle on September 18, 2008. The vehicle was operated by Melissa Bartelme and Christian Adrejat.) Case agents observed Wilson approach the front passenger window of the Cobalt and conduct a brief hand-to-hand transaction with the occupants. A review of phone records revealed that at 1:09 p.m., an incoming phone call to (414) 419-8447, the phone being used by Wilson, from (414) 916-1338, a phone known to be used by Bartelme and Andrejat; at 1:21 p.m., a call occurred from Wilson to Andrejat, and at 1:24 p.m., a call from Wilson to Andrejat. This pattern of calls is consistent with Andrejat and Bartelme arranging a purchase of heroin from Wilson. Following the hand-to-hand transaction, the Chevrolet Cobalt drove out of the area and Wilson entered the rear door of 2545 N. Buffum Street.

On March 12, 2009, case agents conducted surveillance of the alley behind 25xx N. Buffum St. when they observed Bartelme's car drive into the alley. Case agents then observed a white 2002 Dodge Intrepid drive into the alley. Bartelme's car pulled to the side

of the alley and the white Intrepid drove onto the parking slab at the rear of the residence, out of view.

Case agents observed Keith Wilson walk into the alley from the direction of the Intrepid and approach the passenger side of Bartelme's car. Wilson bent down and conducted a brief hand-to-hand transaction with the occupants. Bartelme's car then began to drive north in the alley toward E. Clarke Street. Case agents conducted a traffic stop and confirmed that the driver was Melissa Bartelme, and Andrejat was the front passenger. Case agents were aware that Bartelme was out on bail on Wisconsin Circuit Court Case # 2008CF005266. On October 27, 2008, Court Commissioner Rosa Barillas set a condition of Bartelme's bail that she not to have contact with Andrejat. Bartelme's presence in the auto with Andrejat violated that condition of her bail.

As case agents approached the auto, they observed Bartelme bend forward and reach down toward the floorboard with her right hand. Agents observed an unopened orange and white syringe package on Bartelme's right thigh. Bartelme had previously told case agents she injected heroin. Agents also observed Andrejat reach toward the floorboard with both hands. Case agents asked Bartelme to hand them whatever she had just purchased. Bartelme reached toward the floorboard with her right hand and retrieved three small aluminum folds containing suspected heroin. Case agents asked Bartelme if that was all of the heroin. Bartelme turned toward Andrejat and held out her right hand. Andrejat reached toward the floorboard with his left hand. Case agents observed him hand Bartelme one small, aluminum fold of suspected heroin, which she then handed to case agents.

Bartelme and Andrejat were arrested. As Andrejat stepped from the vehicle after his arrest, case agents observed another orange and white syringe package on the passenger floorboard. As Andrejat was being handcuffed, a black Blackberry cellular phone fell from his left sweatshirt pocket. Case agents retained this phone which was later found to be assigned telephone number (414) 916-1338, subscribed to by R.A. and used by Andrejat and Bartelme.

Case agents searched the Chevrolet Cobalt. In the interior driver's door armrest, they located three additional small aluminum folds of suspected heroin. Case agents also located a light green and white lady's purse that was wrapped around the gear shift knob. In the purse case agents located a blue plastic water bottle containing numerous used syringes, spoons with burn marks on the bottoms and rubber and cloth tourniquets, all paraphernalia associated with the use of heroin by injection. The heroin recovered from Bartelme and the vehicle tested positive for heroin with a total weight of 0.8 grams.

After arrest, both Bartelme and Andrejat stated that the heroin recovered from them had just been purchased from Wilson. A consensual review of the text messages received and sent by Bartelme and Andrejat's phone revealed that Bartelme and Andrejat were trafficking to others the heroin that they purchased from Wilson.

On May 31, 2009, at about 12:38 p.m., case agents conducted surveillance at 25xx N. Buffum St. and observed a blue 2001 Mitsubishi Mirage 4-door, bearing Wisconsin license plates 593-GNG, parked on the rear parking slab behind the residence. A review of Wisconsin DOT records revealed these license plates listed to M. A. B. and D.M.D. At about 12:43 p.m., case agents observed Keith Wilson exit the rear door of 25XX N. Buffum

9

St. and approach the front passenger window of the Mitsubishi. Case agents observed Wilson reach into the vehicle and then withdraw his hand. The auto then drove away from the residence. Case agents followed the vehicle which made several erratic turns. Eventually, case agents were able to see that the driver of the vehicle was Melissa Bartelme and the passenger was Christian Andrejat.

Based upon the investigation agents believe Andrejat and Bartelme supplied three to five people with heroin each day, in small amounts ranging from 0.5 to 2 grams. This includes times where they pooled money with other customers and picked up heroin. Text messages also established they distributed to others.

This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, these offenses.

## PENALTIES

6. The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries the following maximum terms of imprisonment and fines: count three, up to twenty years imprisonment, a $1 million dollar fine, three years to life supervised release and a $100 special assessment.

## ELEMENTS

7. The parties understand and agree that in order to sustain the charge of conspiracy to possess with intent to distribute a controlled substance as set forth in Count Three, the government must prove each of the following propositions beyond a reasonable doubt:

<u>First</u>, the conspiracy, as alleged in the indictment, existed; and

<u>Second</u>, the defendant knowingly and intentionally joined the conspiracy with the intention to further the conspiracy.

## **SENTENCING PROVISIONS**

8. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

9. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

10. The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offense set forth in paragraph 4. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

11. The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## Sentencing Guidelines Calculations

12. The parties acknowledge, understand, and agree that the sentencing guidelines calculations included in this agreement represent the positions of the parties on the appropriate sentence range under the sentencing guidelines. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

13. The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offenses to which the defendant is pleading guilty.

## Base Offense Level

14. The parties are each free to recommend to the sentencing court an applicable base offense level for the offense charged in Count Three.

## Role in the Offense

15. Pursuant to Sentencing Guidelines Manual § 3B1.1, the parties agree to recommend acknowledge and understand that the government will recommend to the sentencing court that no adjustment be given for an aggravating or mitigating role in the

offense, as the defendant was neither/an organizer, leader, manager, or supervisor/a minimal or minor participant.

## Acceptance of Responsibility

16. The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Sentencing Recommendations

17. Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

18. Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

19. The government will recommend a sentence within the applicable sentencing guideline range, as determined by the court.

## Court's Determinations at Sentencing

20. The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 6 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

21. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

22. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable upon entry of the judgment of conviction. The defendant agrees not to request any delay or stay in payment of any and all financial obligations.

23. The defendant agrees that, during the period of any supervision (probation or supervised release) imposed by the court in this case, the defendant will provide the Financial Litigation Unit (FLU) of the United States Attorney's Office with completed financial forms which will be provided by FLU, and will provide any documentation required by those forms. The defendant will provide FLU with such completed financial

forms with required documentation within the first two months of supervision, at six month intervals thereafter during supervision, and within the last six months of scheduled supervision. The defendant acknowledges and agrees that, while he is on supervision, the Probation Department and FLU can exchange financial information pertaining to the defendant in order to facilitate collection of any fine or restitution ordered by the court as part of the sentence in this case.

### Special Assessment

24. The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

### Buy Money

25. The government recommends that the sentencing court order the defendant to pay an amount of government "buy money" paid to the members of the conspiracy, joint and several, as a condition of any term of probation or supervised release imposed by the sentencing court. The defendant does not join in this recommendation.

### DEFENDANT'S COOPERATION

26. The defendant, by entering into this agreement, further agrees to fully and completely cooperate with the government in its investigation of this and related matters, and to testify truthfully and completely before the grand jury and at any subsequent trials or proceedings, if asked to do so. The government agrees to advise the sentencing judge of the nature and extent of the defendant's cooperation. The parties acknowledge, understand and agree that if the defendant provides substantial assistance to the government in the investigation or prosecution of others, the government, in its discretion,

may recommend a downward departure from: (a) the applicable sentencing guideline range; (b) any applicable statutory mandatory minimum; or (c) both. The defendant acknowledges and understands that the court will make its own determination regarding the appropriateness and extent to which such cooperation should affect the sentence.

## DEFENDANT'S WAIVER OF RIGHTS

27. In entering this agreement, the defendant acknowledges and understands that in so doing he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

    a. If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

    b. If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

    c. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

    d. At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other

>   > evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.
>
>   e. At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

28. The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

29. The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

## GENERAL MATTERS

30. The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

31. The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

32. The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

33. The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

### EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

34. The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed

a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## **VOLUNTARINESS OF DEFENDANT'S PLEA**

35. The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 4/22/10

_____
CHRISTIAN ANDREJAT
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 4/22/10

_____
ADAM ESSLING
Attorney for Defendant

For the United States of America:

Date: 4-23-10

_____
JAMES L. SANTELLE
United States Attorney

Date: 4/23/10

_____
GAIL J. HOFFMAN
Assistant United States Attorney